NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0089n.06
Filed: November 16, 2004

Nos. 02-1409/1428

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| IRVIN LAMONT UPSHAW and RODNEY | ) | EASTERN DISTRICT OF MICHIGAN |
| RICE, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Defendants-appellants Irvin Lamont Upshaw and Rodney Rice are former police officers of the fifth precinct of the Detroit Police Department. On April 27, 2001, Upshaw and Rice were each convicted by a jury of various offenses, including substantive and conspiracy RICO offenses. The gravamen of their offenses was that they abused their positions as law enforcement officers for personal gain and, in doing so, violated the rights of others. The district court sentenced Upshaw to incarceration for 240 months and Rice to incarceration for 210 months. On appeal, Upshaw and Rice challenge their convictions and their sentences.

**I.**

At trial, Upshaw and Rice were implicated in numerous criminal incidents. Those relevant to this appeal are recounted separately here.

A. *Canfield Market*

Mike Darwich owned the Canfield Market, a convenience store in Detroit's fifth precinct from which he sold marijuana in addition to legitimate items. Darwich stood behind a counter protected by plexiglass located near the entrance of the store and completed marijuana sales through a slot in the plexiglass. Sometimes marijuana sales were made in the back of the store as well. The enclosed area behind the counter was accessible only through a door that Darwich kept locked. Officers Rice and Upshaw were in the store frequently and were seen behind the plexiglass on occasion. Marijuana sales were completed even when these officers were in the store and in uniform. Several employees at the Canfield Market testified that Darwich asked them if he should pay police officers for protection.

In addition to selling marijuana from the Canfield Market, Darwich also supplied marijuana to dealers for sale on the street. These dealers either paid for the marijuana, or Darwich "fronted" them the drugs by giving them marijuana without initially charging them in exchange for a portion of the proceeds from their sales, which was always greater than the usual cash price at which Darwich sold the marijuana. One dealer testified that Darwich guaranteed him that the police would not interfere with the dealer's sales: "[H]e told me as long as, as long as I was down with him, . . . me and my nephews, we didn't have to worry about the police and going to jail or nothing like that."

Witnesses implicated both Officers Upshaw and Rice as being involved in illicit transactions with Darwich. An employee of the Canfield Market testified that he once saw Upshaw accept money from Darwich. On another occasion, Upshaw gave Darwich a grocery bag containing a sizeable amount of marijuana in exchange for a grocery bag with undisclosed contents.

Rice's most suspect behavior occurred in conjunction with the execution of a search warrant at the Canfield Market. At approximately 6:00 p.m. on January 21, 1999, deputies with the Wayne County Sheriff's Department and law enforcement agents from other jurisdictions, including United States Marshals, executed a search warrant at the convenience store. During the execution of the warrant, the store's phone rang. Robert Pierce, an investigator with the Narcotics Enforcement Unit, answered the phone and assumed Darwich's identity. The man placing the call said, "Are you all right, Mike? We're coming." Pierce heard a siren in the background. The caller then said that "we got an alarm," to which Pierce replied, "Everything's all right," and then hung up. Shortly thereafter, Officer David Dibiasi and Officer Rice arrived at the Canfield Market in a Detroit Police car. Officers Dibiasi and Rice were not involved with the execution of the search warrant. Pierce spoke with Officer Rice, who acknowledged that he placed the phone call to the Canfield Market. Pierce also noted that the number on Officer Rice's police cruiser was 983562.

While the search warrant was being executed at the store, Deputy United States Marshal Diane Mack conducted surveillance of Darwich's home in an unmarked car with a sergeant from the Detroit Police Department. During the course of her surveillance, Mack witnessed a marked Detroit Police car pull up to Darwich's home: "The car approached, slowed down to just a slow-moving thing and flashed a light on the Darwich home." Although Mack could not identify who was in the police car, she noted the number on the car – 983562. After the car shone the light on Darwich's home, it drove away. Mack decided to follow the car in her unmarked vehicle to identify the passengers, but she was unsuccessful because the police car evaded her.

*B. Kenyea Blackshear*

During the summer of 1997, Kenyea Blackshear lived with Jeron Johnson at a home located at 5976 Bewick ("5976") from which he sold marijuana. Johnson testified that, in June 1997, Upshaw visited 5976 looking for Blackshear. At that time, Johnson and O'Shae Martin were in the residence. The front door was open, but a steel security gate protecting the front door was closed. When Upshaw arrived at 5976, he pointed a gun at Johnson and Martin, who could see Upshaw through the bars of the security gate. Upshaw demanded that Johnson and Martin approach the door, and they complied. When they reached the door, Upshaw handcuffed them to the security gate and began asking for keys to the gate. Although Upshaw was in plain clothes, Johnson recognized him as a police officer because Johnson saw a badge, which displayed Upshaw's name, hanging around his neck. Johnson testified that Upshaw next "asked where the keys were. He also asked me where was the marijuana. . . . He asked me where was [Blackshear]." Johnson then noticed another officer in the front lawn, who proceeded to the back of the house, where he found an entrance. Johnson noticed the name on that officer's badge was Goode. Goode searched the house and found keys to the security gate, at which point he unlocked the gate and allowed Upshaw to enter. Goode then proceeded to search the residence while Upshaw questioned Johnson and Martin. According to Johnson, Goode discovered a large bag of marijuana, large amounts of money, a stick of dynamite, a .380 handgun, and an AK-47 firearm.

Upshaw told Johnson, "[Y]ou know that I can take your ass to jail for this gun and this marijuana. But I'm not, because you're making money on my shit anyway." Upshaw next uncuffed Martin and Johnson. Martin was allowed to leave, but Johnson was told to remain. Upshaw began asking Johnson about Blackshear. Eventually, Upshaw asked Johnson to deliver Blackshear a

message: "[W]e know you know who he is and when you see him . . . tell him we're going to fuck him up." Upshaw then hit Johnson with a flashlight, and he and Goode left Johnson locked in an upstairs room. Eventually, Blackshear and Martin discovered Johnson.

On July 24, 1997, Carl Terry was riding in an automobile with Blackshear[1] and Eric Lackey. Blackshear was driving. At one point, Blackshear noticed a police patrol car. Terry testified that Blackshear told Terry and Lackey to "look straight ahead because that's Upshaw and Rice and I ain't paid them." According to Terry, Blackshear "was in sort of a panic" upon seeing the police car. The police car pulled over Blackshear's automobile, and Blackshear rolled down the car's windows. Officers Upshaw and Cook, not Officer Rice, exited the police car and approached Blackshear's vehicle. Officer Cook approached Blackshear's side of the vehicle, and Officer Upshaw approached Terry's side of the vehicle. Officer Cook asked Blackshear for his driver's license and then instructed him to exit the vehicle. Blackshear complied, and he and Officer Cook went to sit in the front seat of the police car. In the meantime, Officer Upshaw began searching Blackshear's vehicle and eventually found a gun in the glove box. He picked up a brown paper bag from the ground, put the gun in the bag, and placed the bag under his clothing. At that point, about five minutes after exiting his vehicle, Blackshear returned to his car. According to Terry, he appeared calm. The officers returned Blackshear's driver's license, and Blackshear and his passengers drove off. Officer Upshaw did not return the gun, and an activity log recording the incident did not reflect that any evidence had been seized during the stop.

---

[1]Blackshear did not testify at trial because he was murdered prior to its commencement.

*C. Jujuan Harrison*

Around March 1997, Jujuan Harrison and Eli Curry pulled up to a convenience store in Curry's automobile. As they exited the vehicle, a police cruiser pulled up behind them. Officer Rice, who was in uniform, and another officer emerged from the police cruiser and summoned Harrison and Curry. Harrison and Curry approached the cruiser, and Curry and Officer Rice began arguing. The officers eventually handcuffed Harrison and Curry, placing Harrison in the cruiser and Curry on the curb of the road. Officer Rice then searched Curry's car for about five minutes, finding a gun. After he completed the search of the car, Officer Rice released Harrison from the cruiser and searched Harrison and Curry themselves. At one point during his search of Harrison, Officer Rice placed him in the back seat of the cruiser and discovered approximately $450 in his pocket, which Rice took. The officers then released Harrison and Curry without arrest or citation. The officers did not, however, return either the gun or the confiscated money.

**II.**

In a first superseding indictment filed on January 13, 2000, Rice and Upshaw were each charged in relevant part with one count of conspiracy against rights in violation of 18 U.S.C. § 241 (Count I), one count of conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Count II), one count of participation in a racketeer influenced and corrupt organization ("RICO") in violation of 18 U.S.C. § 1962(c) (Count IV), one count of conspiring to participate in a racketeer influenced and corrupt organization in violation of 18 U.S.C. § 1962(d) (Count V), and one count of conspiracy to commit extortion in violation of 18 U.S.C. § 1951 (Count VI). In support of the charges of participation in a racketeer influenced and

corrupt organization, the indictment asserted that Rice and Upshaw participated in a pattern of racketeering activity involving numerous violations of federal and state criminal law. Specifically, the superseding indictment charged that Rice participated in sixteen predicate racketeering acts and that Upshaw participated in nine predicate racketeering acts.

## A. Convictions

Ultimately, on April 27, 2001, Rice and Upshaw were each convicted by a jury of Counts I, II, IV, V, and VI in the United States District Court for the Eastern District of Michigan. Rice's and Upshaw's RICO convictions were premised on the jury's finding that each participated in three racketeering acts constituting a pattern of racketeering. The jury found in a special verdict that each had conspired with Darwich and others to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846 (Racketeering Act 18A). The jury also found that Rice and Upshaw conspired with each other and others to extort protection money from Darwich in violation of 21 U.S.C. § 1951 (Racketeering Act 18B).

The jury found that Rice individually also robbed Harrison of approximately $400 in violation of Mich. Comp. Laws § 750.529 (Racketeering Act 12). The third racketeering act the jury found that Upshaw had committed was a robbery of a .32 caliber firearm from Blackshear, also in violation of Mich. Comp. Laws § 750.529 (Racketeering Act 14).

## B. Sentencing

Defendants' cases then proceeded to sentencing. The district court determined that, in evaluating underlying racketeering activity to score the base offense level for Upshaw's and Rice's convictions for conspiracy to violate RICO (Count V) in accordance with United States Sentencing

Guidelines ("U.S.S.G.") § 2E1.1,[2] Upshaw committed seven underlying racketeering acts in furtherance of a RICO conspiracy in addition to those found by the jury in its special verdict under the substantive RICO count, including robbing Johnson and Martin at 5976 on June 12, 1997. As for Rice, the court determined that he committed an additional fifteen underlying racketeering acts in support of his conviction for conspiracy to violate RICO.

Because Upshaw and Rice were each convicted of multiple counts, the district court grouped together the counts involving substantially the same harm in accordance with U.S.S.G. § 3D1.1-.2. The district court then determined the offense level applicable to each group pursuant to U.S.S.G. § 3D1.3.

The highest offense level for any of Upshaw's groups was 30, which the court adopted as the combined offense level. The court enhanced this combined offense level by 5 under U.S.S.G. § 3D1.4 because the other groupings yielded a total of 8 ½ units, and then again by 2 under U.S.S.G. § 3C1.1 on the basis of a finding that Upshaw committed perjury at trial, yielding a final combined offense level of 37. With a criminal history category I, Upshaw was subject to 210 to 262 months incarceration. U.S.S.G. § 5, Pt. A. In addition to supervised release and a criminal monetary penalty, the district court sentenced him to the statutory maximum of 120 months incarceration on Count I and 240 months on each of Counts II, IV, V, and VI, to be served concurrently.[3]

---

[2]This court recently ruled that the United States Sentencing Guidelines continue to be valid in the Sixth Circuit, even after *Blakely v. Washington*, 124 S. Ct. 2531 (2004). *See United States v. Koch*, No. 02-6278, 2004 U.S. App. LEXIS 18138, at *2 (6th Cir. Aug. 26, 2004).

[3]Ordinarily, "the total punishment is to be imposed on each count and the sentences on all counts are to be imposed to run concurrently." U.S.S.G. § 5G1.2, cmt. 1. However, the maximum sentence for conspiracy against rights, Count I, is 120 months. *See* 18 U.S.C. § 241. Hence, the

As for Rice, the highest offense level for any group was 30. The court enhanced the combined offense level by 5 under U.S.S.G. § 3D1.4, because the offense levels for the various groups yielded a total of 13 ½ units, resulting in a combined offense level of 35. At criminal history category I, Rice was therefore subject to 168 to 210 months incarceration. U.S.S.G. § 5, Pt. A. Coupled with supervised release and a criminal monetary penalty, the district court sentenced Rice to the statutory maximum of 120 months incarceration on Count I and 210 months on each of Counts II, IV, V, and VI, to be served concurrently.

The district court entered separate judgments of conviction and sentence against Rice and Upshaw on March 26, 2002. Both defendants filed timely notices of appeal. For the following reasons, we affirm defendants' convictions and sentences.

**III.**

*A. RICO Convictions*

According to 18 U.S.C. § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." A pattern of racketeering activity consists of "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *Id*. § 1961(5). The acts that constitute "racketeering activity" are numerous but include state law robbery felonies, acts

---

sentence on that count was limited to that maximum and could equal the total punishment. *See* U.S.S.G. § 5G1.1(a).

involving controlled substances, and the federal crime of extortion proscribed by 18 U.S.C. § 1951.

*See id.* § 1961(1)(A) & (B). Both Rice and Upshaw were convicted of one count of racketeering in

violation of § 1962(c) and one count of conspiracy to commit racketeering in violation of § 1962(d),

and each challenge their respective convictions for these offenses on numerous grounds.

### 1. Sufficiency of Evidence

#### a. Upshaw

In a special verdict, the jury found that Upshaw committed Racketeering Act 14, an armed

robbery of Blackshear in violation of Mich. Comp. Laws § 750.529. In a motion filed with the

district court for a judgment of acquittal as to his substantive RICO conviction pursuant to Fed. R.

Crim. P. 29(c), Upshaw argued that the jury's determination that he committed Racketeering Act

14 was not supported by sufficient evidence. The district court found that there was sufficient

evidence to support the determination and therefore denied Upshaw's motion, which Upshaw

appeals.[4]

This court reviews the denial of a motion for a judgment of acquittal under Fed. R. Crim. P.

29(c) *de novo*. *United States v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir. 2002). The district court's

denial must be affirmed if we determine, "after reviewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found the essential elements of the crime

---

[4]Even if there is not sufficient evidence to support the jury's finding that Upshaw committed Racketeering Act 14, this error would not warrant reversal of Upshaw's substantive RICO conviction since the jury found beyond a reasonable doubt that Upshaw committed two other predicate acts, specifically Racketeering Acts 18A and 18B. However, since Upshaw's argument regarding the sufficiency of the evidence with respect to the robbery of Blackshear relates to a sentencing claim presented by Upshaw, we address the substance of Upshaw's argument.

beyond a reasonable doubt." *United States v. Turner*, 272 F.3d 380, 383 (6th Cir. 2001) (quotation

omitted). In reviewing the sufficiency of the evidence in support of Upshaw's conviction for

Racketeering Act 14, we are mindful that a jury's determination may be supported by sufficient

evidence "even though the circumstantial evidence does not remove every reasonable hypothesis

except that of guilt." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996) (quotations omitted).

Findings of fact made in conjunction with the denial of a Rule 29(c) motion are reviewed only for

clear error. *Al-Zubaidy*, 283 F.3d at 808.

The elements of armed robbery under Mich. Comp. Laws § 750.529 are: "(1) an assault, (2)

a felonious taking of property from the victim's presence or person, and (3) a perpetrator armed with

a weapon." *People v. Harding*, 506 N.W.2d 482, 500 (Mich. 1993). An assault "is made out from

either an attempt to commit a battery or an unlawful act which places another in reasonable

apprehension of receiving an immediate battery." *People v. Reeves*, 580 N.W.2d 433, 435 (Mich.

1998) (quotation omitted). Additionally, the "assault or putting in fear underlying the robbery must

occur before or contemporaneously with the felonious taking." *People v. Randolph*, 648 N.W.2d

164, 174 (Mich. 2002). As for the requirement that the property be taken in the victim's presence,

"[a] thing is in the presence of a person, in respect to robbery, which is within his reach, inspection,

observation or control, that he could, if not overcome by violence or prevented by fear, retain his

possession of it." *People v. Raper*, 563 N.W.2d 709, 712 (Mich. Ct. App. 1997) (quotation omitted).

Upshaw first argues that the evidence presented at trial was insufficient to demonstrate that

he committed assault in conjunction with the taking of the gun. The issue, then, is whether the

evidence supports a finding that Officer Upshaw attempted to commit a battery or committed an

unlawful act that placed Blackshear in reasonable apprehension of an immediate battery prior to taking the gun.

A reasonable juror could have concluded that Upshaw committed an unlawful act by stopping Blackshear. A temporary stop and detention of a vehicle and its passengers can constitute an unlawful act in violation of the Fourth Amendment if the stop is unreasonable under the circumstances. *See United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003). Generally, a stop is unreasonable if the police do not have probable cause for believing that a traffic violation has occurred. *See id*. Whether an officer had probable cause to stop a vehicle depends on what the officer knew at the time of the stop, not what he discovers after the stop. *See United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996). In an activity log, Officer Upshaw stated that he stopped Blackshear for a seatbelt violation but only warned him of the violation. However, Terry testified that he never heard Officer Upshaw or Officer Cook mention seat belts during the stop and confirmed that no citation was issued. A reasonable juror could conclude from this evidence that Officer Upshaw did not have probable cause to believe Blackshear or his passengers were not wearing seatbelts at the time of the stop and that Upshaw developed this justification after the stop. In other words, a reasonable juror could have concluded that the stop was unlawful because it was not supported by probable cause at the time it was made.

A reasonable juror also could have concluded that this act created in Blackshear an apprehension of an immediate battery. Terry testified at trial that Blackshear "was in sort of a panic" upon seeing the police car. He also testified that Blackshear exclaimed at that point, "[L]ook

straight ahead because that's Upshaw and Rice and I ain't paid them," which suggests that Blackshear feared some form of retribution from Upshaw.

Finally, a reasonable juror could have concluded that this apprehension was reasonable in light of Upshaw's prior threats. In June of 1997, Upshaw told Johnson to issue the following threat to Blackshear: "[W]hen you see [Blackshear] . . . tell him we're going to fuck him up." The district court determined that Johnson informed Blackshear of this comment, a finding which is not clearly erroneous, particularly considering that Blackshear returned to 5976 soon after Officer Upshaw left. A reasonable juror could have concluded that Blackshear regarded this threat as credible considering that, according to Johnson, upon returning to 5976, Blackshear found that Johnson had been assaulted by Officer Upshaw. A few weeks later, Officer Upshaw pulled over a car being driven by Blackshear. Blackshear may reasonably have apprehended that the stop was the first step in effectuating the prior threat. As the district court noted, "[a]lthough a common traffic stop, taken alone, would not seem to a reasonable person as dangerous or threatening, when it is preceded by specifically intimidating threats, as here, the court finds that what appears to the world as an ordinary police-citizen encounter may be in reality, and here was, something more sinister."

Upshaw contends that the threat issued to Blackshear via Johnson cannot constitute assault because that threat did not create in Blackshear a fear of immediate battery. Upshaw's argument is misplaced. The unlawful act giving rise to the fear of immediate battery was not the threat but Upshaw's stop of Blackshear's car. This act reasonably gave rise to this fear because Blackshear was cognizant that Upshaw intended to "fuck him up" upon finding him.

In sum, construing the evidence in a light most favorable to the government and aware of the fact that circumstantial evidence need not remove every reasonable hypothesis except guilt, we find a reasonable trier of fact could have found that Officer Upshaw committed an unlawful act that placed Blackshear in reasonable apprehension of immediate battery prior to taking the gun from his car, which constitutes assault. *Reeves*, 580 N.W.2d at 435.

With respect to whether Upshaw took the gun in Blackshear's presence, Upshaw argues that Blackshear was in the police car with Officer Cook when he actually took the gun from the glove box and that, consequently, he did not take the gun in Blackshear's presence. Upshaw interprets the presence requirement of Michigan's robbery statute too literally. Whether a taking occurs in the presence of a person for robbery purposes "depends on the effect of violence or fear on that person's ability to control his possession of the [object in question] at the time of its taking." *People v. Green*, 580 N.W.2d 444, 450 (Mich. Ct. App. 1998).[5] If a person loses his control over an object as an effect of the fear of an immediate battery instilled in him by an assailant, that object has been taken from his presence. *See id.*; *accord Raper*, 563 N.W.2d at 712-13; *see also People v. Colton*, No. 203518, 1999 WL 33454004, at *1 (Mich. Ct. App. Feb. 19, 1999) (upholding armed robbery conviction where evidence supported finding that "violence or the threat of violence was necessary to sever" the victim's control over the stolen object); *People v. Wiley*, 315 N.W.2d 540, 541 (Mich.

---

[5]Although *Green* technically describes the presence requirement with respect to Michigan's carjacking statute, Mich. Comp. Laws § 750.529a, its discussion of the issue controls here because Michigan courts expressly construe the presence requirement for carjacking and robbery, both armed and unarmed, identically. *See Green*, 580 N.W.2d at 450; *Raper*, 563 N.W.2d at 712.

Ct. App. 1981) ("There is no requirement that the [object] taken be within a victim's presence if it is within his control and he lost control because of the violence of, or his fear of, the defendant.").

The case of *People v. Spry*, 254 N.W.2d 782 (Mich. Ct. App. 1977), is particularly instructive for our purposes. In *Spry*, a woman was forcibly removed from her car by three assailants. *Id*. at 783. Two of the assailants took the victim to their own car and attempted to rape her. *Id*. In the meantime, the third assailant – Robert Spry – entered the victim's car and took money from her purse. *Id*. For this act, Spry was charged with unarmed robbery, to which he pled guilty. *Id*. at 784. Spry, however, appealed the sufficiency of the factual basis for this plea. *Id*. He argued that, since the victim was in another car with the two other assailants at the time he took money from the purse in the victim's car, the evidence was insufficient to show that he took the money in the victim's presence. *See id*. at 786-87. The Michigan Court of Appeals disagreed. It found that the evidence did support such a finding because, had the victim not been forcibly removed from her car and placed in the assailants' car, she would have retained control over the money. *Id*. at 787.

The logic of *Spry* applies here. The only real distinction between *Spry* and the case *sub judice* is that the assailants in *Spry* removed the victim from her car by force, whereas Upshaw was able to extract Blackshear from his car by instilling in him a fear of an immediate battery. However, such a distinction is of no consequence since it is clear that, under Michigan law, the assault element of robbery can be accomplished either by force or by putting the victim in fear of an immediate battery. *Reeves*, 580 N.W.2d at 435. Although the gun may not have been within Blackshear's reach, inspection, or observation at the time it was taken, it was within his control until Officers

Upshaw and Cook put him in fear of an immediate battery by unlawfully stopping him and removing him from his car. In other words, construed in the light most favorable to the government, the evidence supports a finding that Officer Upshaw took the gun in Blackshear's presence because a reasonable juror could have concluded that Blackshear lost control of the gun as a result of the fear instilled in him by Officers Upshaw and Cook and that he could have maintained possession of the gun but for this fear.

### b. Rice

Rice also challenges his RICO convictions for sufficiency of the evidence. To preserve for appeal a claim that a conviction is not supported by sufficient evidence, "a defendant must move for judgment of acquittal during trial or within seven days after the jury is discharged pursuant to Fed. R. Crim. P. 29." *United States v. Horry*, 49 F.3d 1178, 1179 (6th Cir. 1995). If the defendant fails to preserve the claim in the proper manner, he waives the claim and his conviction will be upheld – notwithstanding his assertion that it is not supported by sufficient evidence – unless doing so would result in a manifest miscarriage of justice. *See United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989); *see also Horry*, 49 F.3d at 1179 ("Absent a manifest miscarriage of justice, [a] defendant's failure to move for judgment of acquittal on [a] count constitutes a forfeiture of her right to challenge the sufficiency of the evidence on this count."). If – in an effort to preserve the claim during trial – a defendant challenges the sufficiency of the evidence at the close of the government's proof but does not renew that motion at the close of all the proofs, he has waived the claim, and his conviction will be upheld absent a manifest miscarriage of justice. *United States v. Khalil*, 279 F.3d 358, 368 (6th Cir. 2002). A manifest miscarriage of justice occurs where "the record is devoid of

evidence pointing to guilt." *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (quotation

omitted).

Rice did not file a timely motion for a judgment of acquittal pursuant to Rule 29 following

the discharge of the jury.[6] Nor did he properly preserve the claim during trial. While Rice did

challenge the sufficiency of the evidence after the close of the government's proof, there is no

indication in the record that Rice renewed this motion after the defendants presented their proof.

Because Rice did not renew his Rule 29 motion at the close of defendants' proof or following the

jury's discharge, he failed to properly preserve the issue of whether the evidence is sufficient to

support his convictions. Consequently, we cannot overturn Rice's convictions for lack of sufficient

evidence unless our failure to do so would result in a manifest miscarriage of justice.

Rice presents the following insufficiency of evidence arguments: (1) the government did not

provide evidence that Racketeering Act 18B and Count VI – each charging the same extortion

conspiracy that allegedly violated 18 U.S.C. § 1951 – would have affected interstate commerce if

actualized; (2) the government did not provide evidence that the predicate RICO acts of which

defendants were convicted were related and presented a threat of continuing racketeering activity;

(3) the government did not provide evidence that Rice conspired to distribute and to possess with

---

[6] The jury rendered Upshaw's and Rice's guilty verdicts on April 27, 2001. According to Fed. R. Crim. P. 29(c), Upshaw and Rice had seven days to file a timely motion for a judgment of acquittal, not counting Saturdays, Sundays, and legal holidays. *See* Fed. R. Crim. P. 45(a). Upshaw filed a motion for a judgment of acquittal on May 4, 2001, which was timely. Rice attempted to join this motion for a judgment of acquittal on May 16, 2001. As correctly determined by the district court, this attempt was untimely because it was made beyond the seven day window provided by Fed. R. Crim. P. 29.

intent to distribute controlled substances; and (4) the government did not provide evidence that Rice committed Racketeering Act 12, a robbery of Harrison.

After reviewing the evidence, we find that the only challenge requiring discussion under our extremely limited scope of review is the argument that the evidence presented at trial does not support a finding that the extortion conspiracy charged in the indictment implicated interstate commerce. The Hobbs Act prohibits conspiring to obstruct, delay, or affect "commerce or the movement of any article or commodity in commerce, by . . . extortion." 18 U.S.C. § 1951(a). For the federal government to have jurisdiction to punish a defendant for violating this provision, it must show that the conspiracy in question would have had at least a *de minimis* effect on interstate commerce if actualized. *See United States v. DiCarlantonio*, 870 F.2d 1058, 1060-61 (6th Cir. 1989) ("While a substantive Hobbs Act violation requires an actual effect on interstate commerce, a conspiracy charge requires the government to prove only that the defendants' scheme would have affected commerce."); *accord United States v. Turner*, 272 F.3d 380, 384 (6th Cir. 2001); *see also United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999) (recognizing the continued viability of the *de minimis* standard). The government need not show that the effect on interstate commerce would have been certain but only that it would have been realistically probable. *See United States v. Peete*, 919 F.2d 1168, 1174 (6th Cir. 1990). As a result, Hobbs Act conspiracy convictions "have been sustained notwithstanding the absence of an actual effect on interstate commerce." *DiCarlantonio*, 870 F.2d at 1061-62.

The extortion conspiracy charged in the indictment was one by which defendants and other police officers agreed to threaten to shut down the Canfield Market and its related drug operations

unless Darwich paid them protection money. In other words, the conspiracy of which Rice and

Upshaw were a part proposed that police officers would facilitate drug trafficking in exchange for

money. Congress has expressly recognized that drug trafficking, even if it occurs only intrastate,

necessarily affects interstate commerce in a substantial way:

> (3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because–
>> (A) after manufacture, many controlled substances are transported in interstate commerce,
>> (B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and
>> (C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.
> (4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.
> (5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.
> (6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

21 U.S.C. § 801; *see also United States v. Tucker*, 90 F.3d 1135, 1140 (6th Cir. 1996) ("[D]rug

trafficking is an 'economic enterprise' that substantially affects interstate commerce in numerous

clear ways."). Because the extortion conspiracy of which Upshaw and Rice were a part aimed to

facilitate drug trafficking in exchange for money, that conspiracy would have had at least a *de

minimis* effect on interstate commerce if effectuated.[7] *See United States v. Villafranca*, 260 F.3d

---

[7]In focusing on the argument that the extortion facilitated Darwich's illicit (interstate) drug business, the government implicitly chose not to pursue the seemingly more straightforward

- 19 -

374, 377-78 (5th Cir. 2001) (noting that an extortion conspiracy that facilitates narcotics trafficking

is sufficient to create an effect on interstate commerce for Hobbs Act purposes); *United States v.*

*Box*, 50 F.3d 345, 353 (5th Cir. 1995) (holding that "extortion which deplete[s] funds otherwise

available for drug trafficking obstruct[s] interstate commerce within the meaning of the Hobbs

Act"); *see also United States v. Friedman*, 43 Fed. Appx. 424, 427 (2d Cir. 2002) (finding that

extortion conspiracy affected interstate commerce where victims of extortion were engaged in drug

---

argument that the extortionate conduct affected interstate commerce simply because Darwich owned a convenience store that was involved in interstate commerce. In other words, instead of arguing that the extortion of Darwich itself affected interstate commerce, the government argues that the extortion of Darwich facilitated Darwich's drug trafficking, which in turn affected interstate commerce. Presumably, the government chose this tack as a response to Rice's reliance on a line of cases suggesting that an extortion conspiracy only affects interstate commerce if there is a realistic probability that extortion money will be paid or borrowed from the funds of a company or business engaged in interstate commerce, and not from the victim's personal funds. *See, e.g., United States v. Mills*, 204 F.3d 669, 672 (6th Cir. 2000); *United States v. Buffey*, 899 F.2d 1402, 1405 (4th Cir. 1990); *United States v. Mattson*, 671 F.2d 1020, 1024-25 (7th Cir. 1982).

    Along the same lines, Rice also argues that the government was required to prove that the conspiracy would have had more than a *de minimis* effect on interstate commerce. When an extortion conspiracy aims at victimizing an individual rather than a business entity, the government must show that the conspiracy would have had a substantial effect on interstate commerce rather than merely a *de minimis* one. *See United States v. Chance*, 306 F.3d 356, 374 (6th Cir. 2002); *see also United States v. Wang*, 222 F.3d 234, 237-40 (6th Cir. 2000) (explaining the requirement in the context of analyzing whether evidence at trial was sufficient to show that the robbery of an individual satisfied the jurisdictional element under the Hobbs Act).

    In this case, the government's argument that the extortion conspiracy affected interstate commerce, even if it was only by nature of the link between drug trafficking and interstate commerce, is persuasive. It is unnecessary to consider whether the extortion conspiracy aimed to extort money from Darwich personally, a purpose that might be at odds with a finding of the required interstate commerce effect, or from his convenience store business that was itself involved in interstate commerce, a purpose that would clearly support the required element of effect on interstate commerce.

trafficking); *cf. United States v. Feliciano*, 223 F.3d 102, 119 (2d Cir. 2000) (stating that proof that defendants engaged in drug trafficking can alone satisfy the jurisdictional interstate commerce requirement of the Violent Crime in Aid of Racketeering Act because drug trafficking "is clearly economic in nature and has been found by Congress to have a substantial effect on interstate commerce").

Citing *United States v. Peterson*, 236 F.3d 848 (7th Cir. 2001), Rice argues that the jurisdictional interstate commerce element of an offense under the Hobbs Act must be demonstrated with individualized proof that the act in question had, or would have had, an effect on interstate commerce and that proof of such an effect cannot be accomplished by resorting to congressional findings (such as those in 21 U.S.C. § 801). First, we are not bound by *Peterson*, a Seventh Circuit opinion. *Thomas v. Cohen*, 304 F.3d 563, 579 (6th Cir. 2002). Moreover, *Peterson* is distinguishable. The defendants in *Peterson* were charged with robbing a drug dealer in violation of the Hobbs Act. 236 F.3d at 850-51. The government attempted to satisfy the Hobbs Act's jurisdictional requirement by showing that the robbery affected interstate commerce under a "depletion of assets" theory. *Id*. at 854-55. Under this theory, "[t]he government presents evidence that a business is either actively engaged in interstate commerce or customarily purchases items in interstate commerce, and had its assets depleted by the robbery, thereby curtailing the business'[s] potential as a purchaser of such goods." *Id.* at 854. The *Peterson* court found that the government failed to make this showing because it did not provide evidence that the robbery affected interstate commerce in that there was no evidence that the victim obtained his drugs from out-of-state sources. *Id*. at 854-55. The court noted that "[t]he government's proof should have focused on the nature of

the business robbed and *how the robbery* affected its operation in interstate commerce," *id*. at 856 (emphasis added), and that "the Hobbs Act requires individualized proof *that the robbery* charged affected interstate commerce." *Id*. at 855 (emphasis added). In other words, what was crucial to the court's holding was that the government failed to prove that the robbery had an appreciable effect on interstate commerce, which could have been done with evidence that the robbery diminished the victim's ability to purchase marijuana from out-of-state sources that he normally used.

In *Peterson*, the government did argue that the robbery affected interstate commerce by diverting money from a drug trafficking operation, an operation that – as evidenced by Congress's findings – itself affects interstate commerce. *Id.* The court dismissed this argument because, although drug trafficking itself may affect interstate commerce, it does not necessarily follow that robbing a drug trafficking enterprise – particularly one that operates intrastate – will have an impact on those aspects of the enterprise that do affect interstate commerce. *See id.* at 856. Thus, the court reasoned, to show that a robbery of a drug trafficking enterprise had an effect on interstate commerce, the government must offer particularized proof that the robbery interfered with the enterprise's participation in interstate commerce.[8] *Id.*

In the instant case, the government showed that the extortion conspiracy implicated interstate commerce because the conspiracy aimed to facilitate drug dealing generally, an activity that

---

[8]Parenthetically, we note that the *Peterson* court's discussion of these issues may be mere dicta. The court noted that, "[o]n appeal, the government attempts to convert the case into one where the government proved that the robberies substantially affected interstate commerce because defendants robbed an interstate enterprise. Fatal to the government's appeal is that this theory was not presented to the jury, and thus, cannot support its verdict." *Id*. at 856.

necessarily implicates interstate commerce. A conspiracy to allow a drug trafficking operation to continue in exchange for money would affect interstate commerce if actualized because the mere existence of such an operation implicates interstate commerce, regardless of whether it is an interstate or intrastate operation. The robbery in *Peterson*, on the other hand, did not facilitate drug dealing. Rather, it diverted assets from drug dealing, and the government failed to show that this diversion affected interstate commerce. *Peterson* does not refute the proposition that drug trafficking necessarily implicates interstate commerce. Nor does it dissuade us from holding that a conspiracy to perpetuate a drug trafficking operation would affect interstate commerce if realized. Instead, it merely stands for the proposition that robbing such an operation does not necessarily affect interstate commerce for Hobbs Act purposes and that particularized proof that a specific robbery affected interstate commerce is necessary to satisfy the jurisdictional requirement of the Act.

Rice also contends that *United States v. Turner*, 272 F.3d 380 (6th Cir. 2001), and, by implication, *Chance*, preclude us from relying on congressional findings to uphold his and Upshaw's extortion conspiracy convictions. Both *Turner* and *Chance* involved criminal acts charged under the Hobbs Act taken against gambling operations. *Turner* involved the robbery of a gambling operation, 272 F.3d at 382, and is therefore distinguishable from the case *sub judice* on the same grounds as *Peterson*. *Chance*, however, is analogous to the instant case in the limited sense that it also involved conspiracy to commit extortion under the Hobbs Act, and the defendants in that case also argued that their convictions were not supported by evidence sufficient to show that the

conspiracy would have affected interstate commerce. 306 F.3d at 375-78. Nonetheless, *Chance* is distinguishable on one crucial point.

In *Chance*, the court found that the government could not meet its burden of proving that conspiracies to extort money from illegal gambling operations affected interstate commerce under the Hobbs Act merely by pointing to congressional findings, found at 18 U.S.C. § 1955, that certain gambling activities have such an effect. 306 F.3d at 377-78. The court noted that, "under the Hobbs Act, the government is required to prove beyond a reasonable doubt the interstate commerce element," and that "[n]o congressional findings of fact can substitute for proof on this element." *Id.* at 378.

A key distinction exists, however, between *Chance* and the case under review. Congress has found that only certain forms of illegal gambling implicate interstate commerce and are therefore subject to federal regulation. *See, e.g.*, 18 U.S.C. § 1955(b) (criminalizing illegal gambling businesses, which are defined as including any gambling business that "(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in a single day); *see also United States v. Sacco*, 491 F.2d 995, 999 (9th Cir. 1974) (noting that "Congress had a rational basis for finding that the illegal gambling *proscribed by § 1955* affected interstate commerce" and discussing those findings) (emphasis added). With respect to drug trafficking, Congress has found that *all* drug trafficking – regardless of whether it is interstate or intrastate in nature – necessarily implicates interstate commerce and, therefore, that

the federal government may, under the commerce clause, criminalize all drug trafficking, no matter how minor. *See* 21 U.S.C. § 801. In other words, while only certain gambling operations have been found by Congress to affect interstate commerce, every act of drug trafficking implicates interstate commerce. Therefore, an extortion conspiracy that ultimately aims to facilitate drug trafficking would also necessarily affect interstate commerce if actualized. The government meets its burden of proving that an extortion conspiracy implicates interstate commerce under the Hobbs Act, then, merely by proving that the conspiracy aimed to facilitate drug trafficking. Hence, in this case, the government met this burden by providing evidence that the aim of the conspiracy of which Rice and Upshaw were a part was to facilitate drug trafficking in exchange for money.

We thus reject all of Rice's arguments that the evidence is insufficient to support his convictions and conclude that no manifest miscarriage of justice results from affirming them.

### 2. Jury Instructions

Rice next asserts that the district court erred in instructing the jury as to the elements of extortion, one of the predicate offenses upon which his RICO convictions are based. Rice did not object to the instruction at trial. Hence, we review it for plain error. *United States v. Jones*, 108 F.3d 668, 670 (6th Cir. 1997); Fed. R. Crim. P. 52(b). For Rice to be entitled to relief, then, he must show that the district court's instruction was plainly erroneous and affected his substantial rights in a manner that "seriously affected the fairness, integrity or public reputation of [the] judicial proceedings." *See Jones*, 108 F.3d at 670 (quotation omitted).

The court's instruction on extortion was not plainly erroneous. Rice argues that the court confused the jury when it instructed the jury as to extortion because it did not make explicit the

distinctions between extortion under federal law and extortion under Michigan law, both of which were charged as predicate racketeering acts.[9] Before providing the extortion instruction to the jury, the court explicitly stated that it was instructing the jury "as to the law of extortion under color of official right," a crime that constitutes a "violation of federal law." Furthermore, the district court never instructed the jury as to extortion under Michigan law, nor did the prosecution present a theory of state law extortion to the jury, so the instruction given could not have led the jury to confuse the elements of federal extortion with state law extortion.

In the alternative, Rice argues the court's failure to instruct the jury as to the elements of extortion under Michigan law was reversible error. Failing to instruct the jury as to the elements of a state law offense alleged as one potential predicate act in support of RICO charges, when the government did not proceed on a theory that this predicate act had been established, was not error. Moreover, the failure to give such an instruction did not affect Rice's substantial rights. The only predicate extortion act the jury found Rice committed in support of his conviction for a substantive RICO violation was a federal offense under § 1951. And, even if the jury independently based Rice's RICO conspiracy conviction in part on a finding that he conspired to commit state law

_____

[9]A public official commits the federal offense of extortion under 18 U.S.C. § 1951 when he "has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts," and regardless of whether the public official affirmatively requested or induced the payment in the first instance. *Evans v. United States*, 504 U.S. 255, 268 (1992); *United States v. Blandford*, 33 F.3d 685, 694-96 (6th Cir. 1994). Extortion under Mich. Comp. Laws § 750.213, on the other hand, requires a showing that the offender maliciously threatened the victim to induce the payment of money or to induce the victim to commit or refrain from committing an act against his will. *See also People v. Hubbard*, 552 N.W.2d 493, 505 (Mich. Ct. App. 1996) (discussing elements of § 750.213).

extortion, the conviction is otherwise valid because it is supported by the jury's finding in a special verdict that Rice actually committed three other predicate acts. *See United States v. Giovanelli*, 945 F.2d 479, 489 (2d Cir. 1991) (upholding conspiracy RICO conviction where special verdict form indicated that jury found that defendants had each actually committed at least two predicate acts).

*B. Fair Warning*

Aside from whether the convictions are supported by substantial evidence, Upshaw and Rice assert that their respective convictions for conspiring against rights in violation 18 U.S.C. § 241 (Count I) are independently deficient because they offend the fair warning doctrine. According to this doctrine, a person may not be held criminally liable under a criminal statute unless "the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Untied States v. Lanier*, 520 U.S. 259, 267 (1997); *see also United States v. Cross*, 128 F.3d 145, 148-49 (3d Cir. 1997) (reviewing § 241 conviction with *Lanier* fair warning analysis). Section 241 provides in relevant part that it is a federal offense "[i]f two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." The indictment alleges in part that defendants conspired against rights in violation of § 241 by conspiring to rob citizens on the street while on duty. Defendants claim that it was not reasonably clear at the time of their actions that police officers who robbed citizens deprived those citizens of their constitutional rights and, therefore, that it was not clear that an agreement to do so constituted a conspiracy in violation of § 241.

By stating that two or more persons may not conspire to deprive any other person of their rights, § 241 "incorporate[s] constitutional law by reference" to identify those rights that persons may not agree to violate. *Lanier*, 520 U.S. at 265. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. It is axiomatic that state officers acting under the color of state law who deprive other persons of property without due process violate those persons' Fourteenth Amendment rights. *See, e.g.*, *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 274 (6th Cir. 2003). Furthermore, when a government actor acting under the color of state law specifically "seize[s] property not to preserve evidence of wrongdoing, but to assert ownership and control over the property itself," that action must comply with the due process clause of the Fourteenth Amendment. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52 (1993).

These principles make it abundantly clear that a police officer who robs a victim while on duty acts under the color of state law to deprive a person of property without any semblance of due process. Hence, it does not offend the fair warning doctrine to hold defendants criminally liable under § 241 for conspiring to commit such acts.

C. *Jury Issues*

Both Rice and Upshaw contend that their convictions should be overturned because the district court committed reversible error in substituting a juror. During trial, the district court noted on several occasions that Juror #3, an African-American female, was inattentive. For example, on April 2, 2001, during the examination of a witness the court stopped proceedings and noted that "the

third juror from the left in the back row . . . is completely nodding off."[10]  On April 9, 2001, after charging the jury, the court stated to both parties that "[d]uring most of the Court's principal instructions [Juror #3's] eyes were closed, her hands were folded on the paper in front of her and her chin dropped to her chest in a jerking manner and then would jerk back upright again, whereupon her eyes would open momentarily and then drift closed again and that was repeated several times."  The same day, the court also noted: "[Juror #3] was sleeping during almost all of my instructions this morning, almost all of them. . . .  She missed at least 50 percent, if not 75 percent, of what I was saying in my instructions."

On account of these observations, the district court conducted an *in camera* hearing on April 11, 2001 – after closing arguments and the issuance of preliminary instructions to the jury – to interview Juror #3 to determine whether she would be capable of performing her duties as a juror. At the hearing, the following exchange occurred between the court and Juror #3:

> THE COURT:     Yesterday you were pretty much nodding off during almost all of my instructions, my principle [sic] instructions, those first two hours of the morning.  Was I right about that?
>
> JUROR #3:     Yeah, I had took [sic] a sinus pill.
>
> . . .
>
> THE COURT:     [T]here were some times during the trial that you were . . . nodding off a little bit; and it looked to me as though you would nod off and then kind of wake up. . . .  Am I right about that?

---

[10]The parties do not dispute that Juror #3 was indeed "the third juror from the left in the back row."

| JUROR #3: | I had been taking drowsy sinus pills earlier and then I finally realized what was going on and switched and that's why I started to wake up. . . . [W]hen I did nod, I never went to sleep. |

Juror #3 also said at one point, "I know I was dosing [sic] off." Later in the hearing, counsel for

Upshaw joined the conversation:

| COUNSEL: | Were you sleeping, or were you just nodding? |
| JUROR #3: | I never went to sleep. |
| . . . | |
| THE COURT: | But you were nodding, to the extent that you lost concentration and you missed what was being said. |
| JUROR #3: | I don't believe so. |
| . . . | |
| COUNSEL: | [D]o you think you heard the instructions and heard the evidence and could render a fair verdict in the case? |
| JUROR #3: | I truly feel I did. |

Despite Juror #3's protestations to the contrary, the district court ultimately determined, based upon

its own observations, that Juror #3 had not been sufficiently attentive during trial to deliberate.

Therefore, the court elected to replace her with an alternate.

Upshaw and Rice filed a post-conviction motion seeking a new trial on the ground that the

district court's substitution of Juror #3 constituted reversible error. In denying the motion, the court

noted that "the court personally observed Juror #3 becoming fatigued and going to sleep (or

'nodding off') on a number of occasions during the trial." The court also noted that the Juror #3's

comments during the *in camera* hearing at least supported the conclusion that she was inattentive

at times during the trial. The court further noted that certain of Juror #3's representations conflicted with the court's own observations at trial. On the basis of its personal observations, the court denied Upshaw's and Rice's motion. Upshaw and Rice now reassert their argument that the district court committed reversible error by substituting Juror #3.

A court may "replace any jurors who are unable to perform or who are disqualified from performing their duties" with an alternate juror. Fed. R. Crim. P. 24(c)(1). It is within a trial court's prerogative to substitute for reasonable cause any juror with an alternate, even without consent of either party to the case.[11] *United States v. Warren*, 973 F.2d 1304, 1308 (6th Cir. 1992). A trial court's decision to substitute one juror for another is a ground for reversal, however, when the decision constitutes an abuse of discretion. *United States v. Cantu*, 229 F.3d 544, 550 (6th Cir. 2000). A trial court abuses its discretion if it replaces a juror without a reasonable cause, as such a decision exceeds a trial judge's authority. *See id.*; Fed. R. Crim. P. 24(c). If a trial court's decision to substitute a juror is supported by reasonable cause, reversal is warranted only when the party challenging the substitution can clearly show that he was prejudiced by that substitution. *Warren*, 973 F.2d at 1308.

In this case, the trial judge had reasonable cause to replace Juror #3. A district court's observations of a juror in open court are entitled to deference and may serve as the basis for dismissal under Fed. R. Crim. P. 24(c). *See United States v. Bradley*, 173 F.3d 225, 230 (3d Cir. 1999); *see also United States v. Carter*, 433 F.2d 874, 876 (10th Cir. 1970) (finding that trial court

---

[11]Upshaw complains that the district court impermissibly dismissed Juror #3 *sua sponte*. However, as *Warren* demonstrates, it was within the district court's discretion to do so.

was not required to dismiss a juror who allegedly slept during trial where the trial court determined, based on its own observations, that the juror did not sleep during trial); *cf. United States v. Egbuniwe*, 969 F.2d 757, 761-62 (9th Cir. 1992) (finding trial court's dismissal of a juror under Fed. R. Crim. P. 23(b) permissible where, "[b]ased on his evaluation of the juror's response to his questions, the trial judge . . . concluded that the juror's claim" of impartiality "was not truthful"); *United States v. Ruggiero*, 928 F.2d 1289, 1300 (2d Cir. 1991) (finding that trial court properly dismissed a juror under Fed. R. Crim. P. 23(b) and noting that "we would be rash indeed to second guess the conclusion of the experienced trial judge, based in large measure upon personal observations that cannot be captured on a paper record, that [the juror] was disabled by fear from continuing to participate in the jury's deliberations"). The court determined, on the basis of its own observations at trial, that Juror #3 was grossly inattentive during its instructions to the jury and during certain portions of witness testimony. Since gross inattentiveness during trial may constitute reasonable cause for dismissing a juror under Fed. R. Crim. P. 24(c), *see, e.g., United States v. Warner*, 690 F.2d 545, 555 (6th Cir. 1982), the district court did not abuse its discretion in dismissing Juror #3.[12]

Defendants strenuously argue that Juror #3's statements that she had not slept during trial and that she was capable of rendering a fair verdict demonstrate that the trial court's concerns were unfounded and that it had no basis for which to exclude the juror. However, a trial court is not

---

[12]Rice asserts that the district court did not have a reasonable cause for replacing Juror #3 because Juror #10 was also inattentive during trial. Whether Juror #10 was inattentive during trial is irrelevant to whether the district court had reasonable cause for dismissing Juror #3.

required to accept a juror's insistence that she is capable of performing her duties; rather, a trial

court is entitled to make its own assessment of a juror's ability to render a fair and impartial verdict.

*See Egbuniwe*, 969 F.2d at 762. In light of its own observations, the trial court was not persuaded

by Juror #3's statement that she would be able to perform her duties. We defer to this determination.

*Cf. Ramos v. Rogers*, 170 F.3d 560, 565 (6th Cir. 1999) ("A trial court's credibility determinations

are entitled to considerable deference.").

Rice insists that the substitution of Juror #3 was nonetheless improper because it was based

upon that juror's race. In support of this argument, Rice contends that Juror #10 and Juror #3 were

identically situated and, yet, the district court dismissed Juror #3 – an African-American – while it

retained Juror #10, who is white. When a court substitutes a juror on its own accord, the only

question is whether the decision was supported by a reasonable cause, even when that juror is a

racial minority.[13] *See United States v. McMasters*, 90 F.3d 1394, 1402 (8th Cir. 1996). As

discussed, the district court's decision to substitute Juror #3 was supported by reasonable cause and,

therefore, did not constitute an abuse of discretion.

Upshaw asserts that, even it was supported by a reasonable cause, the decision to replace

Juror #3 warrants reversal because it was clearly prejudicial. Adopting derogatory stereotypes, he

posits that the issues at trial involved interactions between persons who spoke in a manner best

---

[13]The equal protection analysis we apply when evaluating a claim that a prosecutor utilized a peremptory strike to exclude a juror on account of that juror's race is inapplicable here. *Cf. United States v. Jackson*, 347 F.3d 598, 604 (6th Cir. 2003) (articulating standard for evaluating a claim that use of peremptory strikes was racially discriminatory). Even if such a standard applied here, however, the record does not permit a finding that race discrimination motivated the district court to excuse Juror #3.

understood by African-Americans and that the exclusion of an African-American from the jury therefore prejudiced his defense. Upshaw provides no evidence that the language at issue was somehow indecipherable to non-African-American jurors or that Juror #3 specifically better understood the language at issue at trial. Rather, he asks that the court make baseless racial assumptions contrary to our constitutional values, and then find clear prejudice without any foundation other than those assumptions. We reject this argument.

Defendants jointly assert that the district court erred in failing to replace Juror #10, whom they claim was also inattentive during portions of the trial. Defendants urged the district court to replace Juror #10, but the district court refused. In order to demonstrate that a court's refusal to dismiss a juror for cause constitutes reversible error, a defendant must ultimately show that the inclusion of the juror on the jury was actually prejudicial. *See United States v. Taylor*, 207 F.3d 452, 454 (8th Cir. 2000); *United States v. Hursh*, 217 F.3d 761, 768 (9th Cir. 2000). Because defendants make no such showing, we deny this claim.

D. *Sentencing Issues*

Rice and Upshaw challenge their respective sentences on several grounds.

1. *Burden of Proof*

Both defendants challenge the burden of proof applied by the district court in calculating the base offense level of their respective RICO conspiracy convictions under the Sentencing Guidelines. According to defendants, the district court erred in determining that underlying racketeering activity need be supported only by a preponderance of the evidence rather than proven beyond a reasonable doubt.

Under the Sentencing Guidelines, the base offense level for a RICO conspiracy conviction is the greater of nineteen or the offense level applicable to the underlying racketeering activity. U.S.S.G. § 2E1.1. Section 2E1.1 does not specify what evidentiary standard the sentencing court should apply when ascertaining the existence of underlying racketeering activity. This court resolved the ambiguity in *United States v. Corrado*, 227 F.3d 528 (6th Cir. 2000). In *Corrado*, we noted that a RICO conspiracy is not a multi-object conspiracy; rather, "a RICO conspiracy . . . is considered a single object conspiracy with that object being the violation of RICO." *Id*. at 541-42 (quoting *United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir. 1993)). Consequently, "the underlying acts of racketeering in a RICO conspiracy are not considered to be the *objects* of the conspiracy, but simply conduct that is relevant to the central objective – participating in a criminal enterprise. The existence of relevant conduct is determined at sentencing by a preponderance of the evidence." *Id*. at 542; *accord United States v. Tocco*, 306 F.3d 279, 286 (6th Cir. 2002); *United States. v. Corrado*, 304 F.3d 593, 607-08 (6th Cir. 2002). In other words, in calculating the base offense level for a RICO conspiracy conviction under the Sentencing Guidelines, underlying racketeering activity is relevant conduct for the purposes of the sentencing guidelines and need only be proven by a preponderance of the evidence. The district court therefore applied the correct standard at sentencing.

### 2. Drug Quantities

Upshaw and Rice also challenge the district court's drug quantity findings at sentencing. Such findings of fact are reviewed for clear error. *United States v. Vasquez*, 352 F.3d 1067, 1070 (6th Cir. 2003). A finding is clearly erroneous when, although some evidence in the record may

support the finding, the reviewing court – after examining the entire evidence – has the definite and firm conviction that a mistake has been made. *Id.* That the reviewing court would have decided the matter differently is not alone a ground for reversal. *Id*. at 1070-71.

Both Upshaw and Rice challenge the district court's finding that the conspiracies for which they were each convicted under Count II and Count IV, Racketeering Act 18A, involved the sale of 163.29 kilograms of marijuana. When calculating drug quantities attributable to a defendant as conduct relevant to a convicted offense under the Sentencing Guidelines, the district court's determination must be supported by a preponderance of the evidence. *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003).

The district court based its findings with respect to drug quantities attributable to defendants on its determination of the amount of drugs sold from Darwich's store between December 1996 and May 1998, which was the duration of the conspiracies charged in Count II and Count IV, Racketeering Act 18A. The district court found that this span of time encompassed approximately seventy-two weeks and that witness testimony at trial supported the conclusion that Darwich sold at least five pounds of marijuana from his store each week during this period. The court then concluded that, at five pounds a week for seventy-two weeks, Dariwch sold at least 360 pounds of marijuana from the store during the relevant time period, which translates into 163.29 kilograms. The district court then ascribed to defendants' respective conspiracy counts a base offense level of 26 based on its attribution to them of "[a]t least 100 KG but less than 400 KG of Marihuana." U.S.S.G. § 2D1.1(c)(7). The court added to this base offense level a 2 level enhancement for each defendant for possession of a firearm and abuse of trust, resulting in a total offense level of 30.

Eventually, when grouping defendants' various convictions pursuant to U.S.S.G. § 3D1.1, the court grouped Count II, Count IV, Count V, and Count VI together and ascribed to the group as a whole an offense level of 30.

First, defendants claim that it was erroneous for the district court to link them to the drug sales at Darwich's market. The jury, however, specifically found beyond a reasonable doubt both Upshaw and Rice guilty of Count II and Count IV, Racketeering Act 18A, which charged that they conspired with Darwich to possess with intent to distribute and to distribute controlled substances during the relevant time period. These convictions were supported by substantial evidence, and the court certainly could conclude at sentencing that defendants were involved in the drug sales from Darwich's store. Moreover, according to U.S.S.G. § 1B1.3(a)(1)(B), the relevant conduct attributable to these convictions includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." It was not clearly erroneous for the district court to conclude that the quantity of drugs sold from Darwich's market was reasonably foreseeable to defendants as part of the conspiracies in which they participated. Second, defendants argue that the district court's finding as to the quantity of the drugs attributable to them was not supported by a preponderance of the evidence. On the contrary, the district court amply described the evidence upon which it based its findings. *See also United States v. Darwich*, 337 F.3d 645, 663-64 (6th Cir. 2003) (upholding a district court's determination in a separate case of drug quantities attributable to Darwich utilizing a similar method and similar evidence).

Finally, defendants summarily assert that the district court's calculation of the drug quantity attributable to them offends *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Apprendi* holds that "any

fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to jury, and proved beyond a reasonable doubt." *Id*. at 490. The district court did commit one error with respect to *Apprendi*. Count II alleged that defendants violated 21 U.S.C. § 846 by conspiring to violate 21 U.S.C. § 841(a). The penalty for conspiracy under § 846 is the same as the penalty for the substantive offense. *Id*. Hence, the statutory maximum applicable to defendants under Count II is the statutory maximum of the § 841(a) offense they conspired to commit. The statutory maximum applicable under § 841(a) in turn depends upon the quantity of drugs the jury finds beyond a reasonable doubt to have been involved in the offense. *See United States v. Page*, 232 F.3d 536, 543 (6th Cir. 2003). No quantity of marijuana was specified in the indictment as to Count II, nor did the jury make any special findings regarding quantity. When a defendant is convicted for a violation of § 841(a) under an indictment that does not specify the quantity of marijuana at issue and the jury does not make a specific finding as to the quantity of drugs involved, the statutory maximum to which defendants are subject is five years pursuant to § 841(b)(1)(D). *See United States v. Graham*, 275 F.3d 490, 523 (6th Cir. 2001). Therefore, the statutory maximum applicable to defendants under Count II was five years, *i.e.*, sixty months.

The district court violated *Apprendi* by sentencing Rice to 210 months and Upshaw to to 240 months on Count II – each sentence being in excess of the sixty-month statutory maximum applicable to the count – on the basis of its findings by a preponderance of the evidence of the drug quantity attributable to the conspiracy.[14] In addition to violating *Apprendi*, the district court also

---

[14]The district court did not violate *Apprendi* with respect to defendants' sentences on any other count because the court did not exceed the statutory maximum on any other count. The

violated the Sentencing Guidelines by sentencing defendants beyond the applicable statutory maximum for Count II. *See* U.S.S.G. § 5G1.2, cmt. 1 ("Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. The sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum . . . ."); *see also* U.S.S.G. § 5G1.2(b) (incorporating by reference § 5G1.1(a), which provides that, "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence"). The errors, however, were harmless. While defendants' sentences on Count II violate *Apprendi*, the sentences for each run concurrently with valid and equally lengthy sentences each is serving for Counts IV, V, and VI. Therefore, the district court's errors as to Count II "do not add any length to the overall terms of [defendants'] imprisonment" and, consequently, do not affect defendants' substantial rights. *See United States v. Burns*, 298 F.3d 523, 544-45 (6th Cir. 2003); *see also United States v. Rivera*, 282 F.3d 74, 77-78 (2d Cir. 2000) (noting that error would be harmless where sentence on one count violated *Apprendi* but was imposed concurrent with a longer sentence on a second count since the improper sentence would not lengthen defendant's term of imprisonment).

### 3. Firearm Possession

---

statutory maximum applicable to both defendants under Counts IV and V was twenty years, *i.e.* 240 months. *See* 18 U.S.C. § 1963. The court sentenced Rice to 210 months on each count and Upshaw to 240 months on each count. Likewise, the statutory maximum for Count VI was twenty years, *i.e.* 240 months. *See* 18 U.S.C. § 1951(a). The court sentenced Rice to 210 months and Upshaw to 240 months on this count. Finally, each defendant was sentenced to 120 months on Count I, the statutory maximum for that count. *See* 18 U.S.C. § 241.

Defendants challenge the instances where the district court, in accordance with U.S.S.G. § 2B3.1(b)(2)(C), enhanced their robbery offense levels on account of possession of a firearm. According to defendants, these enhancements should not have been applied since police officers are required to possess a firearm while on duty.[15]   A district court's application of the Sentencing Guidelines to facts is reviewed *de novo*.  *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003). The fact that a law enforcement officer is required to carry a firearm in the course of duty does not preclude an enhancement for possession of that firearm.  *See United States v. Sivils*, 960 F.2d 587, 596 (6th Cir. 1992).  In fact, such an enhancement is particularly warranted where "the weapon was closely linked to the very powers and office which [defendant] used to implement his felonious activities."  *Id*. (quoting *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir. 1990)).  Moreover, § 2B3.1(b) provides without qualification that a robbery base offense level shall be enhanced by five levels when a firearm was possessed during the commission of the offense.  Consequently, we find no error in the district court's enhancements of defendants' sentences for possession of a firearm during the commission of a robbery.

### 4. Upshaw's Obstruction of Justice Enhancement

---

[15]Rice also argues that it was erroneous for the district court to find that he possessed a firearm during the robbery of Harrison since Harrison never testified that Rice possessed a gun at that time.  A district court's determination that a defendant possessed a firearm at the time of an offense is reviewed for clear error.  *United States v. Clay*, 346 F.3d 173, 178 (6th Cir. 2003). Harrison testified that Rice was in uniform at the time of the incident.  And Upshaw testified that "[y]ou're supposed to carry a weapon all the time, on or off duty."  Therefore, it was not clear error for the district court to find by a preponderance of the evidence that Rice possessed a firearm at the time of the Harrison incident.

Upshaw argues that the district court erroneously applied a two-level enhancement to his combined offense level under § 3C1.1 of the Sentencing Guidelines for obstruction of justice. Section 3C1.1 provides that a sentencing court may increase a defendant's offense level by two levels

> [i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . . .

Commentary to § 3C1.1 notes that conduct warranting the two-level enhancement includes "committing, suborning, or attempting to suborn perjury." *Id.* cmt. n.4(b). The government must show by a preponderance of the evidence that a defendant committed an obstructionist act under § 3C1.1 for that provision's two level enhancement to apply to the defendant. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002). A district court's factual determination that a defendant committed an act warranting enhancement under § 3C1.1 is reviewed for clear error, while a court's interpretation of the provision is reviewed *de novo*. *United States v. Burke*, 345 F.3d 416, 428 (6th Cir. 2003).

At trial, Upshaw testified in his own defense that marijuana and drug paraphenalia found in the basement of his home during the execution of a search warrant did not belong to him but to his brother-in-law, who at the time of trial was deceased. (Tr. 3764-68.) The district court determined at Upshaw's sentencing hearing that this excuse was perjury because its falsity "was so transparent." The court further explained: "[U]nder a preponderance-of-the-evidence standard . . . there's no excuse. It was his. His fingerprint was on it. It was in his house, under his nose virtually. . . . [I]t's

just ludicrous to think that a veteran police officer would permit a brother-in-law to run a marijuana distribution business from . . . the laundry room of his house. . . . It was false testimony. It was intended to mislead the jury. It was absolutely material . . . . It was perjury, undoubtedly." On the basis of this finding, the district court applied the two-level enhancement provided for by § 3C1.1 to Upshaw's base offense level.

Upshaw asserts that the district court's determination that he committed perjury is clearly erroneous. But he offers no persuasive argument in support of this assertion. Upshaw's first argument relates to Count XIII of the first superseding indictment, which charged Upshaw with knowingly, unlawfully, and intentionally possessing with intent to distribute a quantity of marijuana in violation of 21 U.S.C. § 841. The jury did not reach a verdict on Count XIII. According to Upshaw, this fact demonstrates that some jurors found his testimony as to the marijuana credible. Upshaw then seems to assert, without supporting authority, that the fact that some jurors may have found his testimony to be credible demonstrates that the court's contrary finding is clearly erroneous. First, the fact that the jury did not reach a verdict on Count XIII does not demonstrate that some jury members found Upshaw's testimony to be credible. A myriad of explanations can be offered for why a jury failed to reach a verdict on the count. Second, regardless of whether some jurors who evaluated the evidence under a reasonable doubt standard found that Upshaw did not knowingly possess with intent to distribute the marijuana at issue, Upshaw does not present a persuasive argument for why the court's finding under a preponderance of the evidence standard that Upshaw's testimony constituted perjury is clearly erroneous.

Upshaw next argues that the district court failed to take note of § 3C1.1, Application Note 2, which states that, in making determinations about whether defendants made false statements at trial, the court should consider that false testimony can be the product of faulty memory or confusion rather than a deliberate attempt to mislead the court or the jury. In essence, Upshaw asserts that any falsity in his testimony arose from confusion and was not deliberate. Yet, he provides no basis for finding that the district court's determination to the contrary was clearly erroneous or that his memory actually was faulty or his testimony confused.

Upshaw's third argument is that the district court erroneously considered extraneous testimony. Specifically, Upshaw asserts that the court determined his testimony was false based upon the fact that witnesses at other trials blame other people for offenses with which they are charged. The district court's determination was based on more than a groundless assumption. Rather, the court noted that Upshaw was a police officer and that it was highly unlikely that he was unaware of the presence of drugs found in his home. Finally, Upshaw notes that some of his co-defendants testified at trial and, like him, denied wrongdoing and yet did not have their sentences enhanced under § 3C1.1. This argument has no bearing on whether the district court's finding with respect to Upshaw was clearly erroneous.

*5. Miscellaneous Scoring Issues*

Upshaw argues that the district court should have scored his taking of the .32 caliber from Blackshear as a larceny and not as a robbery. As discussed *supra*, the evidence supports a determination that Upshaw's taking of the .32 caliber was a robbery. Hence, the district court did not err when it scored the taking as a robbery at sentencing.

Upshaw also argues that, since the jury acquitted him of any robbery of Johnson and Martin, it was error for the district court to find that he committed such an offense at sentencing as a racketeering act underlying his conspiracy RICO conviction. The jury's finding is inapposite since it was required to find facts beyond a reasonable doubt, while the district court finds relevant conduct under a preponderance of the evidence standard. The testimony of Johnson and Martin amply supports the district court's finding that the incident occurred, and it is clear that the actions of Upshaw, as found by the court, constituted robbery.

Finally, Rice argues that the district court erred in scoring the Harrison incident as a robbery and, at most, should have scored it as a theft. The jury was instructed as to the elements of robbery and found Rice guilty beyond a reasonable doubt of robbing Harrison. Moreover, there is no indication that the district court's findings of fact with regard to the incident were clearly erroneous. Nor is there any indication that the district court's determination that Rice's actions during the incident constituted robbery is erroneous.

**IV.**

For the foregoing reasons, we affirm defendants' convictions on all counts and their sentences, except as to Count II. We vacate the sentence imposed as to Count II and remand the case for entry of an amended judgment in accord with this opinion.