NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0150n.06
Filed: February 24, 2005

No. 02-1405

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| LARONE COOK, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: NORRIS and GIBBONS, Circuit Judges; and TODD, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Defendant-appellant Larone Cook is a former

police officer of the fifth precinct of the Detroit Police Department. On April 27, 2001, Cook and

his co-defendants Irvin Lamont Upshaw and Rodney Rice were convicted by a jury under a multi-

count indictment for various offenses, including substantive and conspiracy RICO offenses. The

convictions were based on the officers' abuse of their law enforcement positions for personal gain

and violations of the rights of others. The district court sentenced Upshaw to incarceration for 240

months, Rice to incarceration for 210 months, and Cook to incarceration for 175 months. All three

co-defendants challenged their convictions and sentences on appeal. Another Sixth Circuit panel

heard oral argument in the consolidated appeals of Upshaw and Rice in February 2004. The panel

_____

[*]The Honorable James D. Todd, Chief United States District Judge for the Western District
of Tennessee, sitting by designation.

issued an unpublished opinion concerning those appeals on November 16, 2004. *See United States v. Upshaw*, Nos. 02-1409/1428, 2004 U.S. App. LEXIS 24100 (6th Cir. Nov. 16, 2004). While there are slight differences between Cook's appeal and the appeals of Upshaw and Rice, Cook's arguments largely overlap the arguments raised by Upshaw and Rice, and we will dispose of Cook's appeal - at least as it relates to his convictions - in a very similar fashion. We must, however, also consider how the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005), impacts Cook's appeal of his sentence. For the reasons set forth below, we affirm Cook's convictions, vacate his sentence, and remand for re-sentencing in light of this opinion and the *Booker* decision.

## I.

The facts surrounding Upshaw, Rice, and Cook's involvement in various criminal incidents are set out in this court's *Upshaw* opinion. Nevertheless, since the evidence implicating Cook differs somewhat from the evidence implicating Upshaw and Rice, we will both replicate the general factual background from *Upshaw* and also highlight those facts specifically relating to Cook's involvement.

*A. Canfield Market*

Mike Darwich owned the Canfield Market, a convenience store in Detroit's fifth precinct. Darwich sold legitimate items from the Canfield Market, but he also sold marijuana. Darwich conducted the marijuana sales from behind a counter protected by plexiglass located near the entrance of the store. Sometimes marijuana sales were made in the back of the store as well. The enclosed area behind the counter was accessible only through a door that Darwich kept locked. In

addition to selling marijuana from the Canfield Market, Darwich also supplied marijuana to dealers for sale on the streets. These dealers either paid for the marijuana, or Darwich"fronted" them the drugs by giving them marijuana without initially charging them in exchange for a portion of the proceeds from their sales greater than the usual cash price for which Darwich sold the marijuana. One dealer testified that Darwich guaranteed him the police would not interfere with the dealer's sales: "[H]e told me as long as, as long as I was down with him, . . . me and my nephews, we didn't have to worry about the police and going to jail or nothing like that." Several witnesses who were employees at the Canfield Market testified that Darwich asked them if he should pay police officers for protection.

Officer Cook, who went by the nickname "Pretty Boy," and Officers Upshaw and Rice were in Darwich's store frequently. Marijuana sales were completed even when these officers were in the store and even when the officers were in uniform. One witness testified that Cook stood right next to him as he purchased a small amount of marijuana in a clear bag. Another witness testified that he had seen Cook behind the plexiglass window, where Darwich stood while making sales, on at least ten occasions when marijuana sales were made. Also, Cook was present on at least one occasion when Darwich paid Upshaw a large wad of cash. At one point, when Cook and Upshaw were in the store together, Cook took $300 in marijuana sale proceeds from Darnell Rush (a drug dealer for Darwich) while Upshaw and Darwich talked. The police officers were also involved in eliminating competition for Darwich's drug operation. Darwich asked one of his employees to record the addresses of other places in the neighborhood that sold marijuana so that "he could sick his police friends" on them.

On March 25 and 26, 1998, FBI agents, who had the Canfield Market under surveillance and had obtained a court order to wiretap the phone at the market, observed Cook participate in one particularly suspicious series of events at the Canfield Market. The agents parked a "raid van" outside the market, in an effort to stimulate phone conversations regarding drug trafficking. The plan worked, as Darwich engaged in a number of frantic phone conversations, indicating that he thought police were watching the market. On March 26, Darwich called Rice a number of times and paged him twice. When Darwich paged Rice, he entered "911" after entering the phone number of the market. Rice immediately came to the market, and Upshaw drove there in his personal car soon after. Cook, who was Upshaw's partner that day, arrived about an hour later in his police car, after Upshaw had left.[1] Later in the afternoon, a customer knocked on the door, which was locked, and began to walk away. Cook opened the door and let the customer in. A few minutes later, one of Darwich's regular drug customers, Jason Alquiza, drove by the market, saw the police car, and called Darwich, asking "your buddies are there, is it okay?" Darwich assured Alquiza that it was fine to come into the store and buy marijuana. Cook left the market immediately after this conversation took place, and one minute later Alquiza arrived and bought marijuana. A few minutes later, Darwich paged Cook twice, and Cook returned to the market about thirty minutes later. Cook stayed two minutes and left with something in his hand.

*B. Kenyea Blackshear*

---

[1]Although Cook spent a considerable amount of time at the market that day, there is no reference to the market in his activity log for the day.

During the summer of 1997, Kenyea Blackshear was living with Jeron Johnson at a home at 5976 Bewick ("5976") in Detroit and selling marijuana out of the residence. Johnson testified that, in June of 1997, Upshaw and Cook visited 5976 looking for Blackshear.[2] At that time, Johnson and O'Shae Martin were in the residence. The front door was open, but a steel security gate protecting the front door was closed. When Upshaw arrived at 5976, he pointed a gun at Johnson and Martin, who could see Upshaw through the bars of the security gate. Upshaw demanded that Johnson and Martin approach the door. Johnson and Martin complied. When they reached the door, Upshaw handcuffed them to the security gate and began asking for keys to the gate. Though Upshaw was in plain clothes, Johnson recognized him as a police officer because he saw a badge hanging around his neck, which displayed Upshaw's name. Johnson testified that Upshaw next "asked where the keys were. He also asked me where was the marijuana. . . . He asked me where was [Blackshear]." Johnson then noticed Officer Cook in the front lawn. Cook proceeded to the back of the house, where he found an entrance and entered the house. Cook searched the house and found the keys to the security gate, at which point he unlocked the gate and allowed Upshaw to enter. While Upshaw questioned Johnson and Martin, Cook searched the residence. During his search, Cook discovered a large bag of marijuana, large amounts of money, a stick of dynamite, a .380 handgun, and an AK-47 firearm. Cook took these items and left the house with them, returning soon after.

_____

[2]During his testimony at trial, Johnson identified the officer accompanying Officer Upshaw as "Officer Goode," but Johnson had previously confirmed through photo identification that Officer Cook was the other officer present.

Upshaw then told Johnson, "[Y]ou know that I can take your ass to jail for this gun and this marijuana. But I'm not, because you're making money on my shit anyway." Upshaw next uncuffed Martin and Johnson. The two officers let Martin leave, but Johnson was told to remain. Upshaw began asking Johnson about Blackshear. Eventually, Upshaw asked Johnson to deliver Blackshear a message: "[W]e know you know who he is and when you see him . . . tell him we're going to fuck him up." Upshaw then proceeded to assault Johnson by hitting him with a flashlight, at the completion of which Upshaw and Cook locked Johnson in an upstairs room and left. Johnson was eventually discovered by Blackshear and Martin.

Cook was involved in other incidents relating to Blackshear. One that is relevant to this appeal occurred on July 24, 1997. Carl Terry testified[3] that on that date, Terry was riding in an automobile with Blackshear and Eric Lacke. Blackshear was driving. At one point, Blackshear noticed a police patrol car. Terry testified that Blackshear then told Terry and Lackey to "look straight ahead because that's Upshaw and Rice and I ain't paid them." According to Terry, Blackshear "was in sort of a panic" upon seeing the police car. The police car then pulled over Blackshear, after which he rolled down the car's windows. Officers Upshaw and Cook (*not* Officer Rice) then exited the police car and approached Blackshear's vehicle. Officer Cook approached Blackshear's side of the vehicle, and Upshaw approached Terry's side of the vehicle.[4] Officer Cook

---

[3]Blackshear was unable to testify at trial because he was murdered prior to its commencement.

[4]Although Terry's testimony as to which officer approached which side of the car is somewhat confusing, Terry ultimately identified Officer Cook as the one who approached Blackshear's side (the driver's side). The parties agree on this account in their briefs.

asked for Blackshear's driver's license and then instructed him to exit the vehicle. Blackshear complied, and he and Cook went to sit in the front seat of the police car. In the meantime, Upshaw began searching Blackshear's vehicle and eventually found a gun in the glove box. Upshaw then picked up a brown paper bag from the ground, put the gun in the bag, and placed the bag under his clothing. At that point, about five minutes after exiting his vehicle, Blackshear returned to his car. According to Terry, he appeared calm. The officers returned Blackshear driver's license, after which Blackshear and his passengers drove off. The officers did not return the gun. An activity log recording the stop did not reflect that any evidence had been seized during the stop.

*C. Other incidents*

Cook was involved in other robberies as well. In February 1995, Cook, Upshaw, and Rice walked into Omar Gardner's apartment and threatened to beat Gardner if Gardner did not give them any money or marijuana. Although Gardner said that Cook himself did not take any money from him, the other officers took $2500 of Gardner's money and counted it while Cook stood watch over the inhabitants of the apartment.

In another case, Cook and Upshaw encountered Terry Campbell as he was standing on a street corner. The officers got out of their car and made Campbell spread his hands on the car. One of the officers (it is unclear which one) patted Campbell down and took a large sum of money and crack cocaine from him. The officers then ordered Campbell to walk away without returning the money or cocaine.

In the summer of 1997, as Stephen Chapman was leaving a store, Rice and Cook pulled up in a pickup truck. The officers had identified Chapman as a drug dealer. They asked Chapman if

he "wanted to make a donation" and took some of Chapman's drug money. Chapman was driven around by the officers and eventually taken to a building at a high school, where Rice physically beat Chapman.

## II.

On August 10, 1999, Cook, Rice, and Upshaw were charged in an indictment with one count of conspiracy against rights in violation of 18 U.S.C. § 241 and two counts of conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 18 U.S.C. § 846. In a first superseding indictment issued on January 13, 2000, Cook, Rice, and Upshaw were charged with these same offenses in addition to one count of participation in a racketeer influenced and corrupt organization in violation of 18 U.S.C. § 1962(c), one count of conspiracy to participate in a racketeer influenced and corrupt organization in violation of 18 U.S.C. § 1962(d), and one count of conspiracy to commit extortion in violation of 18 U.S.C. § 1951. In this first superseding indictment, Cook and Upshaw were also independently charged with one count of deprivation of rights in violation of 18 U.S.C. § 242 and one count of use and carrying of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1). In support of the charges of participation in a racketeer influenced and corrupt organization, the first superseding indictment asserted that Cook, Rice, and Upshaw participated in a pattern of racketeering activity involving numerous violations of federal and state criminal law. Specifically, the superseding indictment charged that Cook participated in eleven predicate racketeering acts.

*A. Conviction*

Ultimately, on April 27, 2001, Cook, Rice, and Upshaw were each convicted under the first superseding indictment by a jury in the United States District Court for the Eastern District of Michigan. They were each convicted of one count of conspiracy against rights (Count I), one count of conspiracy to distribute and to possess with intent to distribute controlled substances (Count II), one count of participation in a racketeer influenced and corrupt organization (Count IV), one count of conspiracy to participate in a racketeer influenced and corrupt organization (Count V), and one count of conspiracy to commit extortion (Count VI).

The co-defendants' RICO convictions were premised on the jury's finding that each participated in three racketeering acts constituting a pattern of racketeering. The jury found in a special verdict that each had conspired with Darwich and others to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. §§ 841 & 846 (Racketeering Act 18A). The jury also found that each of the three defendants conspired with each other and others to extort protection money from Darwich in violation of 21 U.S.C. § 1951 (Racketeering Act 18B). The third racketeering act the jury found that Cook and Upshaw had committed was a robbery of a .32 caliber firearm from Blackshear in violation of Mich. Comp. Laws § 750.529 (Racketeering Act 14).[5]

*B. Sentencing*

Defendants' cases then proceeded to sentencing. During sentencing, the district court determined that, in evaluating underlying racketeering activity to score the base offense level for the

---

[5]The jury found that Rice individually also robbed Harrison of approximately $400 in violation of Mich. Comp. Laws § 750.529 (Racketeering Act 12).

three defendants' convictions for conspiracy to violate RICO (Count V) in accordance with U.S.S.G. § 2E1.1, Cook committed six underlying racketeering acts in furtherance of a RICO conspiracy in addition to those found by the jury in its special verdict under the substantive RICO count, including robbing Johnson and Martin at 5976 on June 12, 1997. Because Cook was convicted of multiple counts, the district court grouped together the counts involving substantially the same harm in accordance with U.S.S.G. § 3D1.1-.2. The district court then determined the offense level applicable to each group pursuant to U.S.S.G. § 3D1.3.

The highest offense level for any of Cook's groups was 30. The court thus adopted 30 as the combined offense level and determined that, under U.S.S.G. § 3D1.4, the groupings yielded a total of 8 units. As a result, the court enhanced the combined offense level by 5 to 35. With a criminal history category I, Cook was subject to 168 to 210 months incarceration. U.S.S.G. § 5, Pt. A. Ultimately, in addition to supervised release and a criminal monetary penalty, the district court sentenced Cook to the statutory maximum of 120 months incarceration on Count I and 175 months on each of Counts II, IV, V, and VI, to be served concurrently.[6] The district court entered a judgment of conviction and sentence against Cook on March 26, 2002. Cook appealed the judgment on the same day.

**III.**

---

[6]Ordinarily, "the total punishment is to be imposed on each count and the sentences on all counts are to be imposed to run concurrently." U.S.S.G. § 5G1.2, cmt. n.1. However, the maximum sentence for conspiracy against rights, Count I, is 120 months. *See* 18 U.S.C. § 241. Hence, the sentence on that count was limited to that maximum and could equal the total punishment. *See* U.S.S.G. § 5G1.1(a).

*A. RICO Convictions*

According to 18 U.S.C. § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." A pattern of racketeering activity consists of "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *Id*. § 1961(5). The acts that constitute "racketeering activity" are numerous but include state law robbery felonies, acts involving controlled substances, and the federal crime of extortion proscribed by 18 U.S.C. § 1951. *See id*. § 1961(1)(A) & (B). Cook was convicted of one count of racketeering in violation of § 1962(c) and one count of conspiracy to commit racketeering in violation of § 1962(d), and he challenges his convictions for these offenses on numerous grounds.

*1. Sufficiency of evidence*

Cook first challenges his RICO convictions for sufficiency of the evidence. To preserve for appeal a claim that a conviction is not supported by sufficient evidence, "a defendant must move for judgment of acquittal during trial or within seven days after the jury is discharged pursuant to Fed. R. Crim. P. 29." *United States v. Horry*, 49 F.3d 1178, 1179 (6th Cir. 1995). If the defendant fails to preserve the claim in the proper manner, he waives the claim and his conviction will be upheld – notwithstanding his assertion that it is not supported by sufficient evidence – unless doing so would result in a manifest miscarriage of justice. *See United States v. Swidan*, 888 F.2d 1076, 1080

(6th Cir. 1989); *see also Horry*, 49 F.3d at 1179 ("Absent a manifest miscarriage of justice, [a] defendant's failure to move for judgment of acquittal on [a] count constitutes a forfeiture of her right to challenge the sufficiency of the evidence on this count."). If – in an effort to preserve the claim during trial – a defendant challenges the sufficiency of the evidence at the close of the government's proof but does not renew that motion at the close of all the proofs, he has waived the claim, and his conviction will be upheld absent a manifest miscarriage of justice. *United States v. Khalil*, 279 F.3d 358, 368 (6th Cir. 2002). A manifest miscarriage of justice occurs where "the record is devoid of evidence pointing to guilt." *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (quotation omitted).

Cook did not file a timely motion for a judgment of acquittal pursuant to Rule 29 following the discharge of the jury.[7] Nor did he properly preserve the claim during trial. Cook did join Rice's challenge to the sufficiency of the evidence after the close of the government's proof. Yet, there is no indication in the record that Cook renewed this motion after the defendants presented their proof. Because Cook did not renew his Rule 29 motion at the close of defendants' proof or following the jury's discharge, he failed to properly preserve the issue of whether the evidence is sufficient to

---

[7] The jury rendered Cook's guilty verdict on April 27, 2001. According to Fed. R. Crim. P. 29(c), Cook had seven days to file a timely motion for a judgment of acquittal, not counting Saturdays, Sundays, and legal holidays. *See* Fed. R. Crim. P. 45(a). Upshaw filed a motion for a judgment of acquittal on May 4, 2001, which was timely. Cook attempted to join this motion for a judgment of acquittal on May 14, 2001. As correctly determined by the district court, this attempt was untimely because it was made beyond the seven day window provided by Fed. R. Crim. P. 29(c).

support his convictions. Consequently, this court should not overturn Cook's convictions for lack of sufficient evidence unless failure to do so would result in a manifest miscarriage of justice.

To show that a manifest miscarriage of justice would result from failing to overturn his conviction, Cook presents the following arguments: (1) the government did not provide evidence that Racketeering Act 18B and Count VI – each charging the same extortion conspiracy that allegedly violated 18 U.S.C. § 1951 – would have affected interstate commerce if actualized; (2) the government did not provide evidence that the predicate RICO acts of which Cook was convicted were related and presented a threat of continuing racketeering activity; and (3) the government did not provide evidence that Cook committed Racketeering Act 14, the armed robbery of a .32 caliber firearm from Blackshear. Each of these arguments was raised by either Rice or Upshaw in their appeals, and they were all rejected by the previous panel.

Regarding the second argument – that the government did not provide evidence that the predicate RICO acts of which Cook was convicted were related and presented a threat of continuing racketeering activity – Cook cannot seriously maintain that "the record is devoid of evidence pointing to guilt" on this issue. *See id.* Indeed, the previous panel did not even address this argument, which Rice had raised. The previous panel addressed only the interstate commerce and Racketeering Act 14 issues. With regard to the former, the panel's opinion meticulously explains why the interstate commerce argument, which Rice raised and Cook merely joins without elaboration, also fails. *See Upshaw*, 2004 U.S. App. LEXIS 24100, at *28-*40. We adopt but do not reproduce that reasoning in this opinion.

The only insufficient evidence argument raised by Cook for which the applicable analysis is meaningfully different than the analysis set out in the previous panel's opinion is Cook's argument that there was insufficient evidence to support the jury's finding that he committed the armed robbery of a firearm from Blackshear (Racketeering Act 14). The jury also found that Upshaw committed this offense, and this court affirmed the district court's decision rejecting Upshaw's insufficient evidence argument relating to the armed robbery. Since Upshaw's motion for acquittal raising this issue was timely, the previous panel's review was *de novo*, and it held that "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Upshaw*, 2004 U.S. App. LEXIS 24100, at \*16-\*25 (quoting *United States v. Turner*, 272 F.3d 380, 383 (6th Cir. 2001) (quotation omitted)). There are two key differences between Cook's appeal on this issue and Upshaw's appeal. The first is the standard of review, because, as explained *supra*, Cook failed to file a timely motion, and thus this court should not overturn Cook's convictions for lack of sufficient evidence unless failure to do so would result in a manifest miscarriage of justice. The second is that Cook did not actually take the gun from Blackshear's car, as he was sitting with Blackshear in the police car while Upshaw took the gun.

No manifest miscarriage of justice would result from affirming Cook's convictions. In fact, even under the "rational juror" standard, Cook's argument with regard to Racketeering Act 14 would fail. First, even though Cook sat in the car while Upshaw took the gun, a rational juror could have concluded that Cook committed armed robbery under Michigan law. The previous panel's analysis of the assault element with regard to Upshaw applies with just as much force to Cook. *See id.* at

- 14 -

*18-*22. This is true even though Upshaw was the one who told Johnson a few weeks before the traffic stop to "tell [Blackshear] we're going to fuck him up." Cook was present when Upshaw issued that threat and was clearly part of the "we" referred to by Upshaw. He thus placed Blackshear in reasonable apprehension of immediate battery prior to the taking of the gun. Also, even though Cook did not himself take the gun, his actions would likely meet the test for the "taking" of an object under Michigan law, in that Cook and Upshaw worked together to effectuate the taking.[8] *See People v. Green*, 580 N.W.2d 444, 450 (Mich. Ct. App. 1998) ("[A] thing is taken from a person at the time the person loses possession of the thing because of the effect of violence or fear.")[9]; *People v. Spry*, 254 N.W.2d 782, 787 (Mich. Ct. App. 1977); *see also People v. Colton*, No. 203518, 1999 Mich. App. LEXIS 2060, at *3 (Mich. Ct. App. Feb. 19, 1999) (upholding armed robbery conviction where evidence supported finding that "violence or the threat of violence was necessary to sever" the victim's control over the stolen object); *People v. Wiley*, 315 N.W.2d 540, 541 (Mich. Ct. App. 1981) ("There is no requirement that the [object] taken be within a victim's presence if it is within his control and he lost control because of the violence of, or his fear of, the defendant."); *cf. People v. Matthews*, No. 232233, 2002 Mich. App. LEXIS 887, at *1-*3 (Mich. Ct. App. June 18, 2002) (noting conflicting evidence over whether it was defendant or co-defendant

---

[8]The district court explicitly noted that even had Cook timely joined Upshaw's motion for acquittal, Cook's motion would have failed on its merits "in the same way Defendant Upshaw's motion fail[ed]."

[9]Although *Green* technically describes the presence requirement with respect to Michigan's carjacking statute, Mich. Comp. Laws § 750.529a, its discussion of the issue controls here because Michigan courts expressly construe the presence requirement for carjacking and robbery, both armed and unarmed, identically. *See Green*, 580 N.W.2d at 450.

who took the property but finding that trier of fact could reasonably have found that it was defendant). Therefore, any rational juror could have found beyond a reasonable doubt that Cook committed armed robbery, and certainly, his RICO convictions do not represent a miscarriage of justice.

Indeed, an even more important point (because it makes the preceding analysis moot) is the fact that even if there were insufficient evidence to support the jury's finding that Cook committed Racketeering Act 14, this error would not warrant reversal of Cook's substantive RICO conviction, since the jury found beyond a reasonable doubt that Cook committed two other predicate acts (Racketeering Acts 18A and 18B). For all of these reasons, Cook's arguments that the evidence is insufficient to support his RICO convictions are invalid. No manifest miscarriage of justice would result from affirming his convictions.

*2. Ineffective assistance of counsel*

Cook also claims that he received ineffective assistance of counsel, because his attorney failed to timely join Upshaw's motion for acquittal based on the insufficient evidence supporting Racketeering Act 14. Cook did not raise this claim below. "As a general rule, a defendant may not raise a claim of ineffective assistance of counsel for the first time on direct appeal, since such a situation generally precludes an opportunity to develop and include evidence bearing on the merits of the allegations of ineffective assistance in the record." *United States v. Smith*, 981 F.2d 887, 894 (6th Cir. 1992). "The customary procedure followed in this situation by the various circuits is to permit the defendant to raise his ineffectiveness of counsel claim in a proper post-conviction proceeding under 28 U.S.C. § 2255." *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990).

Only when the record below is adequate to consider an ineffective assistance claim will this court consider the merits of a claim on direct appeal. *Id.* There is nothing in the record that would assist this court in resolving the claim, so we do not consider it.[10]

### 3. Jury Instructions

Cook asserts that the district court erred in instructing the jury as to the elements of extortion, one of the predicate offenses upon which his RICO convictions are based. Rice made this argument in his appeal, and the previous panel rejected it. *See Upshaw*, 2004 U.S. App. LEXIS 24100, at *40-*42. We reject Cook's argument for the same reasons set out in the previous panel's opinion.

### B. Other conviction issues

With respect to his convictions, Cook also argues that: (1) his conviction for conspiring against rights in violation 18 U.S.C. § 241 (Count I) is deficient because it offends the fair warning doctrine; and (2) his conviction should be overturned because the district court committed reversible error in substituting a juror. Upshaw and Rice made these same arguments in their appeals, and we reject Cook's arguments for the same reasons set out in the previous panel's opinion. *See id.* at *43-*55.

### C. Sentencing issues

On appeal, Cook raises many of the same sentencing issues raised by Rice and Upshaw. While we agree with the previous panel's analysis of those issues, we must also consider the impact of *Booker* on Cook's sentencing arguments.

---

[10]We note again that the district court stated that even had Cook timely joined the motion, Cook's motion would have failed "in the same way Defendant Upshaw's motion fail[ed]."

Under *Booker*, "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. The district court in this case made a number of determinations at sentencing that were not found by the jury beyond a reasonable doubt. These included the determinations that Cook committed various crimes by a preponderance of the evidence, including a robbery of Jerone Johnson and Shae Martin on June 12, 1997, and a robbery and confinement of Stephen Chapman. For some of these incidents, the episodes were not presented to the jury for a special verdict. For others, the jury specifically found that the government had not proven these acts beyond a reasonable doubt when handing down its special verdict on the racketeering counts. The district court also increased the offense level for some of Cook's offenses based on abuse of trust, possession of a firearm, and drug quantities attributable to the Darwich conspiracy; none of these facts were found by a jury beyond a reasonable doubt. Some of these determinations by the district court increased the number of "units" accrued by Cook under the sentencing guidelines, and in turn Cook's offense level was increased. This resulted in a sentence that violated the Sixth Amendment. *See id.*; *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.")[11]; *see also Blakely v. Washington*, 124 S. Ct. 2531, 2537 (2004) ("The

---

[11]As explained by the previous panel, the district court also violated the rule of *Apprendi* by sentencing Cook to 175 months on Count II (conspiracy to distribute and to possess with intent to distribute controlled substances). When a defendant is convicted for a violation of 21 U.S.C. § 841(a) under an indictment that does not specify the quantity of marijuana at issue, and the jury does

'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant.")

*Booker* suggests that when a defendant fails to raise a Sixth Amendment challenge to his sentence in district court, as Cook failed to do here, we should review the case for "plain error." 125 S. Ct. at 769; *see also* Fed R. Crim. P. 52(b); *United States v. Calloway*, 116 F.3d 1129, 1136 (1997). Under the plain-error analysis set out in *United States v. Olano*, 507 U.S. 725, 732-37 (1993), we find that the district court plainly erred. A plain error occurred; it affected Cook's substantial rights; and the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 732-36 (internal quotation marks and citation omitted). Therefore, a remand for re-sentencing is appropriate.

## IV.

For the foregoing reasons, we affirm Cook's convictions on all counts, and we vacate his sentence and remand for resentencing in light of *Booker* and this opinion.

---

not make a specific finding as to the quantity of drugs, the statutory maximum to which the defendant is subject is sixty months. *See* 21 U.S.C. § 841(b)(1)(D); *United States v. Graham*, 275 F.3d 490, 523 (6th Cir. 2001). As was also the case with Upshaw and Rice, however, this particular error did not "add any length to the overall terms of [Cook's] imprisonment," because the sentence was concurrent with longer sentences on other counts. *See United States v. Burns*, 298 F.3d 523, 544-45 (6th Cir. 2003); *see also United States v. Rivera*, 282 F.3d 74, 77-78 (2d Cir. 2000) (noting that error would be harmless where sentence on one count violated *Apprendi* but was imposed concurrent with a longer sentence on a second count since the improper sentence would not lengthen defendant's term of imprisonment).